UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| RLIS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NOS. 3:12-CV-208 |
| | § | and 3:12-CV-209 |
| | § | |
| ALLSCRIPTS HEALTHCARE | § | |
| SOLUTIONS, INC., and CERNER | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

In this patent infringement suit involving medical-records software, the parties seek construction of several disputed terms contained in the asserted claims of U.S. Patent 7,076,436 (the '436 Patent) and U.S. Patent 5,823,948 (the '948 Patent). This Court held a hearing under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), and now construes the disputed terms as follows.

## I.   BACKGROUND

Dr. James Ross and William Lynch formed Ross Lynch Information Systems, Inc. (RLIS) to develop a system for the collection and storage of electronic medical records. The result was TeleMed, a system that offers users the ability "to input different types of medical information about a patient in an

1 / 39

efficient manner."  Docket Entry No. 50 at 6.  The system's primary function is to create electronic medical records, but it can also be used for other purposes, such as patient billing, patient instructions, and issuing prescriptions.

RLIS owns both the '436 Patent and the '948 Patent, which cover the inventions in the TeleMed system.  The patents share a common specification, which shows the system "arranged in a client-server relation with one or more servers communicating with various work station terminals."  *Id.* at 7; *see also* Docket Entry No. 50-1, '436 Patent, Fig. 1.  The specification and the figures contained within it explain how TeleMed processes information.  Medical information may be entered and saved into the system by clicking buttons, selecting items from dropdown menus, entering text, or dictating or typing a part of a document.  TeleMed also includes predefined text blocks that healthcare professionals can select to insert into a medical record or modify to insert later. *See* Docket Entry No. 50-1, '436 Patent, col. 9 ll. 32–37.

RLIS filed suits for infringement of the '436 and '948 Patents against Defendants Allscripts Healthcare Solutions, Inc. and Cerner Corp.[1]  Several claims in these patents are at issue in this *Markman* ruling.  Claims 2, 4, and 5 of the '948 Patent "cover a method of patient record documentation, tracking and order entry

---

[1]  RLIS filed two lawsuits asserting violations of the same patents, one against Allscripts Healthcare Solutions, Inc., Case No. 3:12-cv-208, and one against Cerner Corp., Case No. 3:12-cv-209.  The parties agreed to consolidate the cases for purposes of the *Markman* hearing.  All citations to docket entries refer to those documents filed in Case No. 3:12-cv-208.

utilizing text generation from data, customizable pre-phrased text, and dictation." Docket Entry No. 50 at 9.  Claims 1 and 6 of the '436 Patent describe "rendering a medical report using [a] language generator . . . to compile sentences and paragraphs from [] raw patient data."  *Id.*  Claims 11 and 24 of the '436 Patent refer "to a method and system for generating patient medical documentation from" prephrased text, dictation narratives, and medical data.  *Id.* at 9–10.

## II.   APPLICABLE LEGAL STANDARDS

"[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court."  *Markman*, 517 U.S. at 372.  In construing disputed terms, "the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'"  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (alterations in original) (quoting 35 U.S.C. § 112).  Claim terms "are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1352, 1360 (Fed Cir. 2008) (citation omitted).

"In some cases, the ordinary meaning of claim language . . . may be readily

apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (citation omitted). But construction of commonly understood words may still be needed if the ordinary meaning does not resolve the parties' dispute regarding the claim's scope. *O2 Micro*, 521 F.3d at 1361. Construction is also necessary when the meaning of a claim term is not readily apparent. *Phillips*, 415 F.3d at 1314. Although a district court has an obligation to construe disputed terms when they affect the scope of the invention, it is "not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." *Millennium Cryogenic Techs., Ltd. v. Weatherford Artificial Lift Sys., Inc.*, No. H-12-0890, 2013 WL 2951048, at *6 (S.D. Tex. June 14, 2013) (citing *O2 Micro*, 521 F.3d at 1360).

When construing disputed terms, there is an established pecking order for the sources a court may consider. The most probative category is intrinsic evidence, which includes the claims, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Within the intrinsic evidence category, a court should begin its analysis by looking "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Id.* (citation omitted). While ordinary meaning usually

governs, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Id.* (citation omitted). The court should also consider the context in which the terms are used in the claims and any differences among the claims. *Phillips*, 415 F.3d at 1314. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* (citations omitted),

As is often the case, much of the parties' disagreement regarding the disputed terms centers on how the specification should influence their construction. *See id.* at 1312 ("The role of the specification in claim construction has been an issue in patent law decisions in this country for nearly two centuries."). Defendants emphasize caselaw stating that the specification is "always highly relevant to the claim construction analysis" and "the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Indeed, the specification may resolve a disputed term when the "ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citation omitted). Plaintiff points out that despite the specification's importance, a court should not "limit [a patentee] to his

preferred embodiment or import a limitation from the specification into the claims," because "[t]he claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1323). "And, even where a patent describes only a single embodiment," as is the case here, "claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (citations and internal quotation marks omitted). The "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323. The overarching goal is to "capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citation omitted).

The final category of intrinsic evidence is the prosecution history, which "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582. "[T]he prosecution

history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citations omitted).

When intrinsic evidence resolves the ambiguity in a disputed claim term, "it is improper to rely on extrinsic evidence." *Id.* at 1583 (citing examples). If, however, ambiguity remains after examining the intrinsic evidence, the court may then consider extrinsic evidence, such as "expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Id.* at 1584 (citation omitted). The Federal Circuit has "especially noted the help that technical dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms." *Phillips*, 415 F.3d at 1318 (quoting *Vitronics*, 90 F.3d at 1584 n.6). "[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## III.   CONSTRUCTION OF DISPUTED CLAIM TERMS[2]

### A.   "Patient Data"

"Patient data" appears in Claims 1 and 6 of the '436 Patent and Claim 2 of the '948 Patent.   For example, Claim 1 of the '436 Patent describes "inputting patient data at a peripheral data input device."   Docket Entry No. 50-1, '436 Patent, col. 47 l. 11.   The parties' disagreement centers on whether "data" should include information that is stored "as text."   RLIS contends that no construction of "patient data" is needed because the term is readily understandable, or that "data" should be given its common meaning of "information."   Defendants contend that the term should be defined to exclude "text."

Defendants acknowledge that the ordinary meaning of "data" is broader, generally applying to any "information," but argue that the intrinsic evidence supports its narrower construction.   Defendants have cited no claim language to support this limitation, but refer to language in the patents' specification stating that "[m]ost information is stored as data, not as text."   *Id.* col. 1 l. 67–col. 2 l. 1; *see also id.* col. 7 ll. 51–52 ("TeleMed stores most medical information as

---

[2] Before the *Markman* hearing, the parties also disagreed about construction of the term "text type associated with each distinguished portion of the input text," which appears in Claims 11 and 24 of the '436 Patent.   Docket Entry No. 50-1, '436 Patent, col. 48 ll. 35–37, col. 50 ll. 2–4. After the hearing, the parties submitted their Amended Joint Claim Construction Chart, in which they agreed that no construction of this term is necessary.   Docket Entry No. 56 at 9.   The parties also agree that the term "patient medical document type" in those same claims should be construed as "[a] type of medical document."   *Id.* at 8.   Because of these agreements, the Court does not address the construction of those terms.

individual specific medical facts rather than as text."). Defendants claim that by drawing this distinction between "data" and "text," RLIS has defined "data" by implication to exclude "text." *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[T]he specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" (quoting *Vitronics*, 90 F.3d at 1582, 1584 n.6)).

RLIS argues that Defendants' construction improperly imports a limitation from the specification embodiment into the claim term. *See Kara Tech. Inc.*, 582 F.3d at 1348 ("The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation for the specification into the claims." (citing *Phillips*, 415 F.3d at 1323)). The Court agrees. Although Defendants have cited some language in the specification that excludes text from the term "data," the exclusion is not made at the level of frequency and clarity that would warrant narrowing what the parties agree is the ordinary meaning of the term. There is a single phrase that distinguishes "data" from "text," and even that phrase does not use the full term "patient data." The other phrase Defendants rely on makes a distinction between "medical facts" and "data." Against this single reference to data that excludes text is other

specification language that can reasonably be read to include "text" as part of "data." *See* Docket Entry No. 50-1, '436 Patent, col. 3 ll. 8–11 ("When a medical summary is produced, *dictated text* is attached to the proper part of the medical record. This allows summaries to include *all data including information which was initially entered by dictation*." (emphasis added)); *see also* Docket Entry No. 50-2, '948 Patent, col. 47 ll. 47–48 (explaining that keyboards may be used to input data). Given that the specification points both ways and no claim language supports limiting "data" to exclude "text," the Court declines to limit the ordinary meaning of "data."

Defendants also argue for a construction that identifies the data's input and storage locations, even though that information, in the exact language Defendants propose, is already included in the claim. *See* Docket Entry No. 50-1, '436 Patent, col. 47 l. 11 ("inputting patient data at a peripheral data input device"); Docket Entry No. 50-2, '948 Patent, col. 47 ll. 47–48 ("entering patient data in the multiple CPUs by touch screens, mouses and keyboards"). Repeating words in the construction that are already included in other parts of the claim language—in this instance, just a few words away—is unnecessary and confusing. *See LG Elecs., Inc. v. Hitachi, Ltd.*, No. 5:07-CV-90 (DF), 2008 WL 5869671, at *15 (E.D. Tex. Dec. 8, 2008) (finding "no need to repeat" language already appearing elsewhere in a disputed term's claim language).

10 / 39

After eliminating Defendants' text and location limitations, the competing proposed constructions are substantially similar. Both explain that the data is "stored," either on a "computer" or "as data."  The Court therefore adopts RLIS's proposed construction for "patient data": "computer stored patient information." This construction affords the term its plain and ordinary meaning and does not unnecessarily import limitations from the specification or repeat portions of the claim language.

### B.   "Medical Data Facts"

Construction of this claim term is similar to the previous term because the parties' dispute again centers on whether "data" may include "text" and the parties advance similar arguments.  Defendants point to the specification, which explains that "TeleMed stores most medical information as individual specific medical facts rather than as text."  Docket Entry No. 50-1, '436 Patent, col. 7 ll. 51–52.  But again, the term "individual specific medical facts" that is the source of the claimed limitation is not identical to the claim term "medical data facts."[3]  For the reasons discussed above under "patient data," one description of a similar, but not identical, term in the specification is too slender a reed upon which to override the

---

[3] At the *Markman* hearing, the parties represented that the term "medical data facts" does not appear at all in the patents' specification.  Defendants argue that "medical data facts" and "medical facts" are used interchangeably throughout the claims and specification, so reference to the latter can inform construction of the former.  Importantly, Defendants previously contended that the term "medical facts" was not amenable to construction and therefore indefinite. Although Defendants later withdrew this position, it does undercut the argument that these terms are interchangeable.

ordinary meaning of "data."

The parties also disagree about whether the information contemplated by "medical data facts" must be "regarding a patient."  Plaintiffs argue that medical data facts exist independent of a specific patient until TeleMed associates those facts with a patient.  Claim 11 of the '436 Patent describes its method as "associating multiple pieces of information regarding a patient with a patient medical information record," and includes among these multiple pieces "medical data facts."  *Id.* col. 48 ll. 8–9, 16.  Defendants did not present an argument in support of this phrase in the briefing and stated at the hearing that its inclusion would only matter in the context of a method claim.  The Court views "regarding a patient" as surplusage given the presence of that language elsewhere in the claim.

Removing the "text" and "regarding a patient" limitations, the remaining proposed constructions are substantially similar.  Both describe "medical data facts" as "medical facts" that are "stored."  The Court accordingly adopts RLIS's proposed compromise construction: "computer stored medical facts."  This definition tracks the term's plain and ordinary meaning, does not unnecessarily import limitations from the specification, and is consistent with the Court's construction of "patient data."

### C.   The   Transcription   Terms:   "Transcribed   Dictation,"   "Transcription Center," and "Transcribing the Dictation"

Claims 11 and 24 of the '436 Patent describe "transcribed dictation" as a type of input text.  Docket Entry No. 50-1, '436 Patent, col. 48 ll. 11–12, col. 49 ll. 21–22.  Claim 2 of the '948 Patent describes "transmitting the dictation over lines to a transcription center, [and] transcribing the dictation" as a part of the patent's method.  Docket Entry No. 50-2, '948 Patent, col. 47 l. 53–col. 48 l. 1. None of the claims further illuminate how dictation becomes text.  RLIS contends that these transcription terms do not require construction because the terms' plain and ordinary meanings are sufficient.  In fact, the parties' proposed constructions agree that "dictation" should be construed as "speech" and that the transcription terms contemplate that the speech is transformed into "text."   But the parties strongly disagree over how that text becomes speech.   Defendants contend that the terms reflect manual transcription performed by human transcribers, while RLIS seeks a definition that is broad enough to encompass transcription performed by voice recognition software.

Defendants argue that the specification contemplates human transcribers performing a manual transcription.  According to Defendants, the specification "repeatedly and consistently acknowledges that 'transcribed dictation' is generated manually by transcribers."   Docket Entry No. 51 at 20.   Figure 1 of the specification shows "transcribers" as a component of the system.  Docket Entry

13 / 39

No. 50-1, '436 Patent, Fig. 1.   The specification also teaches that "[a] telephone system [] provides communications with . . . a transcription service which serves transcribers" and that "dictation is transmitted over voice lines to a transcription center where the dictation is transcribed."   *Id.* col. 5 ll. 28–29, 42–43.   Nurses and doctors may input patient information "by dictating to a transcriptionist" or "[p]hysicians can dictate parts of the medical record to a dictation company or in-house dictation department."   *Id.* col. 2 ll. 56–57, col. 9 ll. 40–41.   Defendants argue that use of these terms in the specification makes clear that transcription terms contemplate a physical location where speech is converted to text by a human transcriptionist.

RLIS contends that Defendants' proposed construction improperly imports a limitation from the specification onto the claim terms, but offers no intrinsic evidence to support its contention that the transcription terms encompass voice recognition technology.   Instead, to support its contention that a person skilled in the art would have understood these terms to include such technology in 1996 when the patent application was submitted, RLIS points to extrinsic evidence such as its business plan contemplating use of voice recognition software and a dictionary definition of "transcription machine."

RLIS's characterization of Defendants' position as seeking a limitation on the claim terms presupposes that the ordinary meaning of "transcribed dictation,"

"transcription center," and "transcribing the dictation" includes voice recognition software.   The Court does not agree with that premise.   The general term "transcription" by itself may be broad enough to ordinarily include voice recognition software, but the claims use specific terms with modifications of "transcription" that when read in context shed light on the meaning of the others. *See Phillips*, 415 F.3d at 1314 (noting that "the context in which a term is used in the asserted claim can be highly instructive" and that "[o]ther claims of the patent in question . . . can also be valuable sources of enlightenment as to the meaning of a claim term."). A review of Claim 2 of the '948 Patent demonstrates the importance of context to this construction:

> . . . dictating portions of the record that are unique to particular patients, transmitting the dictation over lines to a transcription center, transcribing the dictation and transmitting the dictation transcriptions to at least one communication server, feeding the dictation transcriptions to the file servers as text . . . .

Docket Entry No. 50-2, '948 Patent, col. 47 l. 51–col. 48 l. 3.  Most instructive is the term "transcription center," whose ordinary meaning connotes a physical location where transcription occurs and necessarily provides context to the transcriptions that are produced at the center and then transmitted to servers.  The term "transcribing the dictation" describes what happens after the dictation is received at the center, so when read in context, that term also supports the view that a person was engaged in the transcription activity occurring at the center.  The

resulting "dictation transcriptions" are then transmitted to "at least one communications server" and fed to "the file servers as text." The Court therefore concludes that when the transcription terms are read in context of the full claim and each other, the natural meaning is of transcription conducted by medical transcriptionists.

The specification lends considerable support to this view. It uses a number of different terms to describe those performing the transcription, but they consistently contemplate human involvement: "transcribers," "a transcription service," "a transcriptionist," and "a dictation company or in-house dictation department." *See* Docket Entry No. 50-1, '436 Patent, col. 5 ll. 28–29, col. 2 ll. 56–57, col. 9 ll. 40–41. Nothing in the specification supports the idea that voice recognition software is performing the transcription. The Court is not, as RLIS contends, using the specification to limit what would otherwise be the plain meaning of the "transcription" terms. Rather, the specification's consistent, frequent, and unambiguous references to transcription that is performed manually reinforces the most natural understanding of these terms based on the claim language. Construing these terms to contemplate human transcription but not voice recognition software thus "stays true to the claim language and most naturally aligns with the patent's description of the invention . . . ." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d

1243, 1250 (Fed. Cir. 1998)).

RLIS's extrinsic evidence does not cast doubt on how the claims and specification use these terms.  It relies on a dictionary definition of "transcription machine."  If that term appeared in the claims, the Court would not need a dictionary to know that machine meant a nonhuman transcriber, but "machine" does not appear in the claims or specification.  RLIS also submitted documents showing that voice recognition software existed in 1996, *see* Docket Entry No. 53-4 at 3–4, but that does not establish that "transcription center" was commonly understood at the time to include software rather than a location where "transcriptionists" worked.  Finally, RLIS points to a business plan it prepared six months before submission of the patent applications that discussed the possibility of using voice recognition software, though it rejected use of the software because many users did not view this type of system as desirable.  *See* Docket Entry No. 53-5 at 3.  It is difficult to see how this extrinsic evidence indicating that the software was not widely used in the industry at the time the applications were submitted shows that a person of ordinary skill in the art would have understood the term "transcription" to include use of such technology.

Accordingly, the Court adopts Defendants' proposed constructions of the transcription terms.  "Transcribed dictation" is "speech that has been manually transcribed to text by a transcriber"; "transcription center" is "a facility where

dictated speech is manually transcribed into text by transcribers"; and "transcribing the dictation" is "manually converting dictated speech into text by a transcriber."

### D.    "Pre-Phrased Text"

The term "pre-phrased text" appears in Claims 11 and 24 of the '436 Patent. Claims 11 and 24 describe "pre-phrased text" as being "retrieved from an electronic data storage apparatus." Docket Entry 50-1, '436 Patent, col. 48 ll. 13–15, col. 49 ll. 23–25; *see also id.* col. 5 l. 63 (explaining in the specification that "[p]reprased text examples are stored in the file servers"). Both parties' proposed constructions agree that "pre-phrased" text is text that has been "prestored." They differ concerning whether that prestored text can be modified prior to being stored.

RLIS advocates for a construction that includes the modifiable nature of the prestored text. It notes that the specification, in multiple instances, describes prestored text as "personalized." *See id.* col. 3 ll. 12–15 ("Prephrased text: these computer system data entry screens allow medical personnel to select prestored personalized text phrases to be included in specific medical record components."); *id.* col. 5 ll. 64–67 ("Individual physicians and nurses preliminarily select pre-phrased text examples as personalized text for compiling with data to produce medical English textual summaries and reports."). In this dispute, it is Defendants who invoke the principle that courts should not import limitations from the specification, arguing that RLIS's proposed construction would exclude the "pre-

phrased text" that is not customizable.  RLIS responds, and the Court agrees, that Defendants' argument misconstrues RLIS's proposed compromise construction: a plain reading of the construction—"prestored modifiable text available for later selection"—demonstrates that the proposal reflects the term's ability to be modified, through use of the suffix "-able," rather than requiring that the text be modified.  Docket Entry No. 56 at 7.  Defendants' argument regarding improper importation of limitations in the specification is thus unavailing.

The next dispute over this term involves Defendants' proposed construction that "pre-phrased text" is text "combined with data to produce medical English textual summaries and reports."  Docket Entry No. 50 at 26.  Defendants argue that both the express claim language and the specification support such a construction. *See, e.g.*, Docket Entry No. 50-1, '436 Patent, col. 48 ll. 25–26, 38–39 (describing a method for "generating . . . a patient medical document" in part by "inserting text corresponding to the pre-phrased text retrieved from an electronic data storage apparatus"); *see also id.* col. 5 ll. 64–67 ("Individual physicians and nurses preliminarily select pre-phrased text examples as personalized text for compiling with data to produce medical English textual summaries and reports.") Defendants' proposal ignores that the claim language does not require that "pre-phrased text" be included in each patient record that the TeleMed system produces. "Pre-phrased text" exists within that system independently from other data, even

when not included in a patient record.   No part of the claim language or specification requires that "pre-phrased text" always be "combined with data to produce medical English textual summaries and reports."   Docket Entry No. 50 at 26.  Certainly that step may occur, but Defendants' proposal implies that it always does, rather than acknowledging that "pre-phrased text" is stored on the system whether or not it is included in the patient record.

RLIS's proposed construction, in contrast, accurately reflects the plain meaning of the term, acknowledges that "pre-phrased text" can be, but is not required to be, included in an electronic medical record, and recognizes the term's customizable nature.  For these reasons, the Court adopts RLIS's proposed compromise construction: "prestored modifiable text available for later selection."

## E.    "Information Specification"

"Information specification" appears in Claims 11 and 24 of the '436 Patent. Both share the same language and describe "generating . . . a patient medical document based upon . . . an information specification corresponding to the patient medical document type identification that specifies the portion of the multiple pieces of information to be included in the patient medical document."  *See* Docket Entry No. 50-1, '436 Patent, col. 48 ll. 25–32.  RLIS argues that this phrase needs no construction because it is a self-defining term when read in context with the remaining claim language.  Should the Court determine that construction is

necessary, RLIS proposes to define the term as a "specification of information to include in the patient medical document."  Docket Entry No. 50 at 28.

Defendants argue that RLIS's construction is circular and confusing. Indeed, RLIS's proposal merely repeats the term words in a different order and adds additional words that are already in the claim language.  But Defendants' proposal—"[a] document template that defines the content of a patient medical document by specifying the information to be included in the document, as well as the location that the information should be inserted"—is no better.  *Id.*  RLIS takes issue with Defendants' use of "template" because the word does not appear in the specification and does not sufficiently encompass the complexity of the information specification's function.  The only evidence Defendants' cite to support using "template" is a quotation from the specification that explains that medical records are generated "in a standardized format from the data in the database."  Docket Entry No. 50-1, '436 Patent, col. 2 ll. 54.  From this they argue that the "information specification" is the "template" that sets forth the "standardized format."  But it is not clear from the context of the quotation that this language refers to the information specification, and Defendants have presented no evidence to show that a person of ordinary skill in the art would understand that "information specification" and "template" can be used interchangeably.

RLIS also argues that the "information specification" does not have to

specify the location of the information to be included in the patient record, only the portions of the information to be included.  The relevant claims describe the information specification as generating a patient document using three types of text.  *See, e.g.*, *id.* col. 48 ll. 25–42.  The first type of text, "input text," is inserted "at locations within the patient medical document."  *Id.* col. 48 ll. 34–35.  Defendants argue that the location language associated with input text demonstrates that the information specification dictates the location that information is placed in a patient medical record.  RLIS counters that this location language is not associated with the other two types of text the information specification uses, and therefore should not be included in the term's definition.  The Court agrees that including Defendants' proposed location language is improper, not only because it unnecessarily limits the information specification's function, but also because it seeks to repeat nearby claim language.

Both proposals before the Court thus fall short for different reasons.  The Court finds that no construction of this term is necessary because, when read in conjunction with the remaining claim language, it is apparent that the "information specification . . . specifies the portion of the multiple pieces of information to be included in the patient medical document."  *Id.* col. 48 ll. 28–32; *cf. Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in lower court's refusal to construe "irrigating" and "frictional heat").

### F.    "Report Rendering Component"

"Report rendering component" appears in Claims 1, 3, 6, and 9 of the '436 Patent. Claim 1 describes "[a] method for rendering a report" in part by "transferring the tabled patient data from the server to a report rendering component, and compiling sentences and paragraphs by the report rendering component from the stored sentences and phrases and the patient data." Docket Entry No. 50-1, '436 Patent, col. 1 ll. 7, 16–20. RLIS argues no construction is necessary, because it is "a short phrase composed of simple words that the jury will readily understand when read in the context of the claim." Docket Entry No. 50 at 17. After the *Markman* hearing, the parties submitted proposed compromise constructions, mooting several disagreements in the briefing regarding this term.

Defendants' post-hearing proposal defines "report rendering component" as "[s]oftware that, when executed, generates patient records by taking medical facts associated with patient data and inserting those medical facts into sentence structures." Docket Entry No. 56 at 4. RLIS's remaining relevant objection to this construction asserts that "Defendants' construction would have the 'report rendering component' merely inserting facts into pre-written sentences," but "[t]he patents are directed to more than just insertion and cover systems that use the input facts and data to select and rephrase the text strings to build the report." Docket Entry No. 50 at 18. Defendants' construction relies heavily on the prosecution

history, in particular RLIS's explanation in an appellate brief before the U.S. Patent and Trademark Office that the "report rendering component combines the sentences and phrases with the tabled patient data to generate structured sentences incorporating the patient data." Docket Entry No. 51 at 18 (citation omitted). But the plain meaning of "report rendering component" and the words "combines" and "incorporating" do not imply the mere insertion of facts into sentence structures. Furthermore, to the extent the proposal seeks to repeat nearby claim language in the construction, it is redundant. Defendants also argue that the proposed construction "is directed to the most basic conversion of medical facts into sentence structures." *Id.* (emphasis omitted). But defining "report rending component" in terms of its "most basic" operation is not consistent with the Court's obligation to "capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments." *Retractable Techs.*, 653 F.3d at 1305 (citation omitted).

In contrast, RLIS now proposes to define "report rendering component" as a "component that generates a report." Docket Entry No. 56 at 4. Defendants take issue with this construction on the ground that it "simply combine[s] the definitions of the individual words" instead of "flow[ing] from analysis of the specification and other intrinsic evidence." Docket Entry No. 51 at 11. The Court disagrees. RLIS's proposal is not based on a combination of the definitions of

"report," "rendering," and "component"; the only word changed is "rendering," which is simplified to "generates," a word that accurately reflects the ordinary meaning of "rendering" and is more likely to be understood by a jury. Indeed, Defendants included that word in their own proposed construction.

The Court's "analytical focus must begin and remain centered on the language of the claims themselves." *Interactive Gift Express*, 256 F.3d at 1331 (citation omitted). Given the parties' apparent agreement that the word "generates" is a synonym for "rendering," and the "widely accepted meaning of commonly understood words" such as "report" and "component," this is a case in which "the ordinary meaning of claim language . . . may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314 (citation omitted). As compared to Defendants' proposal, RLIS's more accurately tracks the plain and ordinary meaning of the claim term without limiting the term to its most basic function. For these reasons, the Court adopts RLIS's proposed compromise construction: "component that generates a report."

### G.    "Word and Sentence Generation and Coordination Software"

Claim 2 of the '948 Patent describes "[a] method of patient record documentation, tracking and order entry" that includes "storing word and sentence generation and coordination software in the peripheral CPUs." Docket Entry No. 50-2, '948 Patent, col. 47 ll. 42–43, col. 48 ll. 5–6. The parties agree that this term

requires construction and each side submitted a proposed compromise construction following the *Markman* hearing.  RLIS proposes to construe this term as "software that generates a report," while Defendants propose "[s]oftware that, when executed, generates patient reports by taking medical facts associated with patient data and inserting those medical facts into sentence structures."  Docket Entry No. 56 at 21.

Construction of this term is substantially similar to that of "report rendering component," and the parties agree that their arguments with respect to that term also apply here.  For example, RLIS again argues that Defendants' proposed construction limits the invention by defining it as only inserting facts into prewritten reports.  In response, Defendants specifically incorporate by reference their "report rendering component" arguments.  Accordingly, the Court will follow the reasoning used in construing "report rendering component."

The parties' proposed compromise constructions agree that "software" needs no further definition, and that the software at issue "generates a report" or "generates patient reports."  The plain meaning of "word and sentence generation and coordination software" does not imply the mere insertion of facts into sentence structures.  Further, it is unnecessary to repeat the claim language "peripheral CPUS" in defining the disputed term.  *See LG Elecs., Inc.*, 2008 WL 5869671, at *16 (finding "no need to repeat" language already appearing elsewhere in a

disputed term's claim language).  The Court therefore adopts RLIS's compromise construction—"software that generates a report"—because it tracks the plain and ordinary meaning of the claim term without limiting the term to its most basic function or repeating other claim language.

### H. "Compiling Sentences and Paragraphs"

This disputed term appears in Claims 1 and 6 of the '436 Patent.  For example, Claim 6 describes "[a] method for rendering a report" in part by "compiling sentences and paragraphs by the report rendering component from the stored sentences and phrases and the patient data, and thereby converting stored medical patient data, including the input patient data, into medical facts in sentence structure."  Docket Entry No. 50-1, '436 Patent, col. 47 ll. 38, 47–51.  Again, RLIS contends that no construction of this term is necessary, but offers a proposed construction and a proposed compromise construction.  RLIS's compromise construction seeks to define the term as "converting, transforming or translating prestored text and patient data to produce sentences and paragraphs," while Defendants propose "[c]ombining pre-stored text with patient data to produce sentences and paragraphs."  Docket Entry No. 56 at 5.  Each party thus agrees that the disputed term involves producing sentences and paragraphs from prestored text and patient data; the disagreement concerns whether "compiling" means merely "combining" or the broader "converting, transforming or translating."  *Id.*

The Court concludes that construction is needed because this dispute affects the scope of the claims.  It further concludes that Defendants' "combining" is too narrow, but RLIS's "converting, transforming or translating" is too broad.  The first of these three terms—converting—is supported by the claim language, the specification, and the prosecution history.  The claim language "thereby converting" modifies the term "compiling" that is used earlier in the sentence. Docket Entry No. 50-1, '436 Patent, col. 47 ll. 47–51.  This is not a situation where two words are used differently giving rise to the implication that they must mean something different; instead "thereby converting" is describing what happens at the "compiling" stage.  The specification also supports construing "compiling" as "converting," explaining that "[w]hen displaying these facts in an on-screen medical summary or on printed medical records, these facts are quickly converted to complex sentence structure similar to physician's dictated medical text." *Id.* col. 7 ll. 52–56; *see also id.* col. 2 ll. 61–64 ("When the summary is called up on screen or as a printout, all of the patient data is converted into medical English text and reads as if it had been dictated by a nurse or doctor.").  The inventors also defined "compiling" to mean "converting" during the prosecution of the patent: "The rendered reports thus contain sentences and paragraphs *compiled* from the patient data and stored sentences and phrases.  The invention *converts* raw medical facts, stored for example in a database, into meaningful readable medical

28 / 39

documentation . . . ."  Docket Entry No. 38-6 at 15 (emphasis added).  Although
Defendants cite the inventors' use of "combining" in a "Summary of the
Invention" contained in a PTO filing, *see* Docket Entry No. 50-7 at 2, this
reference is not sufficient to limit "compiling" to that lesser term of "combining"
given the repeated use of "converting" in the claim, specification, and elsewhere in
the prosecution history.  For these reasons, "converting" is a proper construction of
"compiling."

But RLIS takes too broad a view of "compiling" when it seeks to include the
higher-order functions of "transcribing" and "translating."  Unlike "converting,"
these terms do not appear in the claims, specification, or prosecution history.  RLIS
relies on the Microsoft Computer Dictionary, which defines "compile" to mean
"translating    any    high-level    symbolic    description    into    a    lower-level
symbolic . . . format."    Docket Entry No. 50-6 at 4; *see also id.* (defining
"compiler" as "any program that transforms one set of symbols into another by
following a set of syntactical and semantical rules").  The definition from that
technical dictionary is out of context when it comes to this patent, which describes
a method for "compiling sentences and paragraphs," not symbols.  Docket Entry
No. 50-1, '436 Patent, col. 47 l. 47.  Finally, RLIS argues that a construction that
does not include "translating" and "transforming" would fail to capture the full
complexity of the invention.  But it is "the claims of a patent [that] define the

invention to which the patentee is entitled the right to exclude," *Phillips*, 415 F.3d at 1312 (quoting *Innova*, 381 F.3d at 1115), not some undelineated function.  The Court therefore adopts the following construction of compiling: "converting prestored text and patient data to produce sentences and paragraphs."

## I.      "Preliminarily Inputting Pre-Phrased Personalized Text"

Claim 5 of the '948 Patent explains the method of Claim 2 as "storing prephrased text examples in the peripheral CPUs and preliminarily inputting prephrased personalized text by individual physicians and nurses, and compiling the personalized text with patient data."  Docket Entry No. 50-2, '948 Patent, col. 48 ll. 29–33.  Both sides submitted proposed compromise constructions for this term after the *Markman* hearing, again mooting some of the briefing arguments.

Defendants now propose "[p]reliminarily inputting pre-phrased text examples modified by individual physicians and nurses for compiling with patient data to produce medical English textual summaries and reports."  Docket Entry No. 56 at 22.  A cursory comparison of Defendants' proposal and the claim language shows that almost every word in the proposal appears elsewhere in the claim.  *See* Docket Entry No. 50-2, '948 Patent, col. 48 ll. 30–34.  For example, Defendants' proposal attempts to limit who can modify the personalized text to individual physicians and nurses, but the words "by individual physicians and

nurses" immediately follow the disputed term.  Similarly, the step of compiling personalized text with patient data appears in the claim language, in almost the precise language Defendants propose.  Defendants' proposal thus just leads to redundancy, without clarifying the terms "preliminarily inputting" or "pre-phrased text."

RLIS now proposes "storing modified text," Docket Entry No. 56 at 22, but the context of the disputed term contradicts this construction.  According to the language of Claim 5, the method of Claim 2 is first "storing prephrased text examples in the peripheral CPUs," then "preliminarily inputting prephrased personalized text by individual physicians and nurses," and finally "compiling the personalized text."  Docket Entry No. 50-2, '948 Patent, col. 48 ll. 29–33.  Given the use of both terms in the same sentence to describe two different steps, "preliminarily inputting" must mean something different than "storing."  "Storing" thus is not an adequate synonym for "preliminarily inputting" in this context.

"Preliminarily inputting" is sufficiently clear and distinct from "storing" that the Court agrees with Defendants that those two words do not need further explanation.  That leaves "pre-phrased personalized text."  The Court agrees that RLIS's proposed "customized text" captures the meaning of this term.  Therefore, the Court adopts the following construction: "preliminarily inputting customized text."

## IV.   APPLICABILITY OF 35 U.S.C. § 112(F)

The parties' remaining dispute hinges on whether several terms from the '436 Patent should be interpreted as "means-plus-function" terms, subjecting them to further construction.  35 U.S.C. § 112(f)[4] allows a patent applicant to express a claim element "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof," and requires that such a claim "be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."   35 U.S.C. § 112(f). Specifically, Defendants contend that the following are generic terms that describe nothing more than a function without the corresponding structure to perform that function: "computer system under software control," "computer executable database software," "an editing software utility," "executable software," and "computer software."  Docket Entry No. 51 at 41.

When, as is the case here, the word "means" is not used in a term alleged to be subject to section 112(f), a rebuttable presumption arises that the section does not apply.  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).  This presumption "can be overcome if it is demonstrated that the claim term fails to recite sufficiently definite structure or else recites function

---

[4] Congress amended 35 U.S.C. § 112 in 2011, restructuring its subsections; the section now numbered as 112(f) was previously numbered as 112(6).  *See Moody v. Aqua Leisure Int'l*, No. H-10-1961, 2012 WL 5335842, at *8 n.42 (S.D. Tex. Oct. 26, 2012).  The restructuring had no substantive effect on the applicable law.  *Id.*

without reciting sufficient structure for performing that function." *Id.* (citation and internal quotation marks omitted). The Federal Circuit has instructed that the claim term need not recite a specific structure. *Id.* at 1359. "[I]t is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Id.* at 1359–60 (citations omitted).

"[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome," *id.* at 1358 (citations omitted), and Defendants have failed to overcome it here. They present no evidence to show that the claims at issue fail to connote sufficient structure to a person skilled in the art. They rely heavily on *Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*, No. C 09-2651, 2010 WL 2292316 (N.D. Cal. June 7, 2010), in which the district court found that "computer" was a generic term that "d[id] not adequately describe a specific structure." *Id.* at *12 (citations omitted). In that case, however, only two of the eight alleged means-plus-function claim terms did not include the word "means." *Id.* at *13 (charting the disputed claims and their constructions). Those two disputed terms were recited in language identical to other disputed terms, "except that 'means for' ha[d] been replaced with 'computer.'" *Id.* at *12. The district court thus found the two claims replacing the words "means for" with "computer"

could not "escape means-plus-function status." *Id.  Soque Holdings* also relied on many cases in which means-plus-function status was not in dispute or the word "means" was specifically recited in the claim language.  *Id.* (citing *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1331 (Fed. Cir. 2008) ("The district court noted that the parties agreed the term 'control means' is a means-plus-function term . . . ."); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) ("The district court applied the presumption that the patentee's use of 'means' renders this step a means-plus-function claim term . . . ."); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1362 (Fed. Cir. 2008) (affirming district court's holding that claims recited in means-plus-function format were invalid)).

Furthermore, the terms at issue in this case are more specific than "computer."  The Federal Circuit requires only that the claim recite some structure. *See Lighting World*, 382 F.3d at 1359–60.  "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'"  *Id.* at 1360.  Thus the Federal Circuit has held that even broad words can connote sufficient structure provided they are not "generic structural term[s] such as 'means,' 'element,' or 'device'" or "coined term[s] lacking a clear meaning such as 'widget' or 'ram-a-fram.'"

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (reversing finding that "digital detector" should be construed as a means-plus-function limitation because "'detector' had a well-known meaning to those of skill in the electrical arts connotative of structure"); *see also Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320–21 (Fed. Cir. 2004) (holding that "circuit" and "circuitry" limitations were not means-plus-function limitations because the claim language contained "a recitation of the respective circuit's operation in sufficient detail to suggest structure to persons of ordinary skill in the art").

RLIS cites numerous cases in which courts have found that terms similar to those at issue here are not subject to section 112(f).  *See, e.g.*, *Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 810 (E.D. Tex. 2011) (finding that "computer readable program code for . . ." and "software comprising computer executable instructions [to] . . ." were not subject to section 112(f) (alterations in original)); *Convolve, Inc. v. Dell, Inc.*, No. 2:08-CV-244-CE, 2011 WL 31792, at *18 (E.D. Tex. Jan. 5, 2011) (finding the terms "code to . . ." and "code providing . . ." did not require construction under section 112(f) in part because "only software implementations are covered by this claim"); *Aloft Media, LLC v. Adobe Sys. Inc.*, 570 F. Supp. 2d 887, 898 (E.D. Tex. 2008) ("The Court therefore finds that the 'computer code' elements . . . recite sufficiently definite structure to

35 / 39

avoid the ambit of [section 112(f)].").

Viewed in the context of the claim language, the terms at issue are more than just nonce words or substitutes for the phrase "means for."  To take the most general example, Defendants argue that "computer software" is subject to construction under section 112(f).  Putting this phrase in its context, Claim 34 describes "computer software for recording a time at which a particular piece of information is submitted for a patient medical record."  Docket Entry No. 50-1, '436 Patent, col. 50 ll. 39–41.  In *Aloft Media*, the district court found that a similar term, "computer code for working in conjunction with a network browser," recited sufficient function when placed in its context.  570 F. Supp. 2d at 897–98 (citing *Linear Tech. Corp*, 379 F.3d at 1320, and reasoning that "'computer code' for performing a specific function is analogous to a claim that recites a 'circuit' for performing a specific function").

Similarly, this Court finds that "computer software," when read in context, recites sufficient function to escape the application of section 112(f).  Claim 34 is a component of Claim 32, and Claim 32 is a component of Claim 24.  Claim 24 lists multiple system components and steps for generating a patient medical document. *See* Docket Entry No. 50-1, '436 Patent, col. 49 ll. 11–42, col. 50 ll. 1–9.  Thus when "computer code" is read in conjunction with the claims it references, "sufficient structural meaning is conveyed to persons of ordinary skill in the art."

*Aloft Media*, 570 F. Supp. 2d at 898; *see also Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) ("'[C]omputer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions.").

The remaining terms that Defendants argue are subject to construction under section 112(f)—"computer system under software control," "computer executable database software," "an editing software utility," and "executable software"— recite even more specific functions than does "computer software."  As was the case in *Affymetrix*, here Defendants have "failed to provide any evidence or caselaw to support the proposition" that the terms at issue are generic.  *Affymetrix*, 132 F. Supp. 2d at 1232.  Furthermore, Defendants' "proposition improperly would subject every software patent and many electronics patents" to the application of section 112(f).  *Id*.  The Court finds that the disputed terms recite sufficient structure.  For these reasons, further construction is not warranted.

## V.    CONCLUSION

The Court hereby adopts the following constructions of the disputed claim

terms:

| Disputed Term ('436 Patent) | Court's Construction |
|---|---|
| "patient data"<br>(Claims 1 and 6) | computer stored patient information |
| "report rendering component"<br>(Claims 1, 3, 6 and 9) | component that generates a report |
| "compiling sentences and paragraphs"<br>(Claims 1 and 6) | converting prestored text and patient data to produce sentences and paragraphs |
| "pre-phrased text"<br>(Claims 11, 19, 24 and 30) | prestored modifiable text available for later selection |
| "medical data facts"<br>(Claims 11, 12, 18, 24, and 29) | computer stored medical facts |
| "patient medical document type"<br>(Claims 11 and 24) | a type of medical document<br>[agreed] |
| "transcribed dictation"<br>(Claims 11 and 24) | speech that has been manually transcribed to text by a transcriber |
| "information specification"<br>(Claims 11 and 24) | no construction necessary |
| "text type associated with each distinguished portion of input text"<br>(Claims 11 and 24) | no construction necessary<br>[agreed] |

| Disputed Term ('948 Patent) | Court's Construction |
|---|---|
| "patient data"<br>(Claims 1 and 6) | computer stored patient information |
| "word and sentence generation and coordination software"<br>(Claim 2) | software that generates a report |
| "transcription center"<br>(Claim 2) | a facility where dictated speech is manually transcribed into text by transcribers |
| "transcribing the dictation"<br>(Claim 2) | manually converting dictated speech into text by a transcriber |
| "preliminarily inputting prephrased personalized text"<br>(Claim 5) | preliminarily inputting customized text |

Further, the Court finds that 35 U.S.C. § 112(f) does not apply.

**IT IS SO ORDERED.**

**SIGNED** this 16th day of July, 2013.

_____
Gregg Costa
United States District Judge